**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)**

| | |
|---|---|
| **TNT SALES & SERVICE, INC.** )<br>2706 Meadow Tree Drive )<br>White Hall, MD 21161 )<br> )<br>And )<br> )<br>**BJQ SALES & SERVICE, LLC** )<br>2706 Meadow Tree Drive )<br>White Hall, MD 21161 )<br> )<br>And )<br> )<br>**THOMAS M. SMITH** )<br>2706 Meadow Tree Drive )<br>White Hall, MD 21161 )<br> )<br>And )<br> )<br>**TONY M. TROMBLEY** )<br>2421 Clyde Pl SW )<br>Canton, Ohio  44710 )<br> )<br>And )<br> )<br>**DUANE A. SMITH** )<br>714 N. Houcksville Rd )<br>Hampstead MD, 21074 )<br> )<br>     *Plaintiffs* )<br> )<br>v. )<br> )<br>**RENT-A-CENTER EAST, INC.** )<br>3rd Floor )<br>5700 Tennyson Parkway )<br>Plano, Texas 75024 ) | Civil Action No.:_____ |

```
Serve: The Corporation Trust, Inc.  )
       Resident Agent               )
       351 West Camden Street       )
       Baltimore, MD 21201          )
                                    )
    Defendant                       )
```

## COMPLAINT

Plaintiffs TNT Sales & Service, Inc. ("TNT"), BJQ Sales & Service, LLC ("BJQ"), Thomas M. Smith ("T. Smith"), Tony M. Trombley ("Trombley") and Duane A. Smith ("D. Smith") (collectively "Plaintiffs"), by and through their undersigned counsel, files this Civil Action against RENT-A-CENTER EAST, INC., Defendant, and allege as follows:

## INTRODUCTION

1.       This Civil Action arises out of Defendant's breach of two Agreements of Purchase and Sale for three franchised ColorTyme locations from Plaintiffs.

## PARTIES

2.       Plaintiff TNT is an Ohio corporation with its principal place of business in Canton, Ohio.

3.       Plaintiff BJQ is a Maryland limited liability company, owned by T. Smith and D. Smith, both Maryland residents.

4.       Plaintiff T. Smith is an individual and a resident of Maryland

5.       Plaintiff D. Smith is an individual and a resident of Maryland.

6.       Plaintiff Trombley is an individual and a resident of Ohio.

7.       Defendant is a Delaware corporation with its principal offices in Texas. Defendant does substantial business in Maryland and is registered to do business in Maryland.

**JURISDICTION AND VENUE**

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (a)(1) because there is complete diversity between the parties, which are incorporated and domiciled in different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     This Court has personal jurisdiction over the Defendant because they transact business and perform in Maryland, contract to supply services in Maryland, and because this is an action arising out of their contract with a Maryland limited liability company, BJQ.

10.    This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391 (a) because this action is founded on diversity of citizenship and a substantial part of the transactions the marketing, sale, lease and delivery of the equipment that comprises the subject matter of the suit occurred in this state.

**ALLEGATIONS OF FACT**

11.    Plaintiffs incorporate by reference the facts set forth in Paragraphs 1 through **Error! Reference source not found.**.

12.    TNT and BJQ are franchisees of ColorTyme rent-to-own stores, which includes two stores in Pennsylvania (Hanover and York, PA), which were operated by BJQ until July 11th, 2012, and a store in Canton Ohio, which was operated by TNT until July 11th, 2012. The franchises are evidenced by written franchise agreements.

13.    Each franchise agreement, among other provisions, contains a clause that grants to ColorTyme, Inc., the franchisor, a right of first refusal over any attempted sale of assets or stock/equity in the franchisee.

14.     T. Smith is the majority owner in both TNT and BJQ; Trombley is a co-owner of TNT; D. Smith is a co-owner of BJQ.

15.     On or about June 12th, 2012, BJQ and TNT notified ColorTyme, Inc. that they intended to sell substantially all of their assets to third parties, and attached to such notice, the letters of intent for such proposed sales, which were dated June 11th 2012.

16.     On or about June 19th 2012 ColorTyme, Inc. provided email notice to BJQ and TNT, through T. Smith, that ColorTyme, Inc. was exercising its rights under the right of first refusal clauses in the franchise agreements.  The franchise agreements do not provide for email as a form of notice, however, the parties had transacted business and given notices and approvals by email for many years.

17.     On or about June 19th 2012, the parties began negotiating the final definitive purchase agreements and other details of the transaction.

18.     On or about July 2nd 2012, Defendant, through Defendant's acquisition manager, Andrew Bowers, Director of Acquisitions & Development for Defendant ("Bowers"), sent to T. Smith, proposed Agreements of Purchase and Sale.  Bowers is an authorized agent of Defendant and had the actual, implied and apparent authority to negotiate and conclude the purchase of stores by the Defendant. Bowers stated to T. Smith that he was the authorized person at Rent-a-Center to complete the transaction, and that he would ensure that all persons who had to "sign off" on the deal would approve the final deal.

19.     During the course of negotiation of the Agreements of Purchase and Sale, T. Smith provided a revised draft to Defendant, which proposed to add ColorTyme, Inc. as a party and terminate the

franchise agreements. Defendant objected to this provision, deleted it, and in response to the revisions, on or about July 6th 2012, provided T. Smith with three proposed unilateral "General Releases" which proposed to release ColorTyme, Inc. and any of its affiliates from any claims.

20. The General Releases also proposed a 2 year confidentiality provision with a "penalty" clause for violation of the confidentiality provision equal to one years' worth of royalty payments. No such penalty clause is present in any franchise agreement. The Plaintiffs, acting through T. Smith, refused to sign the "General Releases" and communicated such refusal to Bowers on or about July 9th, 2012.

21. In response, Bowers indicated that this "was a ColorTyme issue" and did not again raise any requirement that the "General Releases" were required to be executed to complete the Agreements of Purchase and Sale.

22. The parties continued to exchange revised drafts of the Agreements of Purchase and Sale until approximately July 10th, 2012, when T. Smith had sent over final typographical and name issues. The parties by email indicated that the Agreements of Purchase and Sale were final and completely finished. See Final Agreements of Purchase and Sale, attached hereto as **Exhibit 1** and incorporated herein by reference.

23. The parties agreed that the transfer date was July 11th, 2012, and proceeded to queue up wire transfers, contact lenders for lien releases and otherwise complete the transactions on July 11th, 2012.

24. On July 11th, 2012, Defendant sent its agents into all three stores and "took control over the stores" by, among other things: replacing electronic payment equipment with Defendant owned and

controlled equipment; instructing employees that they were Rent-a-Center employees, and contacting existing customers to inform them that they would now be Rent-a-Center stores.

25. In the early morning of July 11th, 2012, T. Smith required assurance from Bowers that the Agreements of Purchase and Sale were final and the deal was complete. In two separate emails in the morning of July 11th, 2012, Bowers confirmed to T. Smith that the deal was complete, stating "Yes, the deal is approved but is not complete until our operations team is done with their due diligence. *But the final draft is approved by RAC and Colortyme*" and "Tom, I'm going to see if I can find someone to execute the agreements once our due diligence is completed. *If I can't than this email indicates that this deal is completed* once our due diligence is performed at the store level." See Emails from Bowers, dated July 11th, 2012, attached hereto as **Exhibit 2** and incorporated herein by reference.

26. Defendant's practice has been to conduct transactions exactly in this manner – complete all drafts, and then come into the stores, review the customer contracts and inventory, then complete the documents and fund the payment. Defendant completed its due diligence in the early afternoon of July 11th, 2012. At no time has Defendant indicated that due diligence was not complete.

27. As further evidence that the transaction was complete, Defendant's real estate personnel signed and fully executed the lease assignments, agreeing to be assigned and take responsibility for all of the leases on the stores subject to the transactions described herein. See Lease Assignments executed by Defendant and attached hereto as **Exhibit 3** and incorporated herein by reference.

28. Further, Plaintiffs signed over and delivered executed titles to the vehicles identified in the Agreements of Purchase and Sale to Defendant on July 11th, 2012. Thus, both parties had taken all the steps to complete the transactions evidenced in the Agreements of Purchase and Sale on July 11th, 2012.

29. At no point from July 9th 2012, as described above in Paragraph **Error! Reference source not found.**, until approximately 11am on July 11th, 2012, did any person from either Defendant or ColorTyme, Inc. contact T. Smith or any of the Plaintiffs regarding the "general releases" that T. Smith had previously stated were not acceptable. On July 11th in the morning, T. Smith was requesting confirmation that the wire transfers had been initiated. At approximately 11:00 am on July 11, 2012, Michael Landry, Vice President of Franchising and Development for ColorTyme, Inc. called T. Smith, which was the first communication from anyone at ColorTyme, Inc..

30. Mr. Landry indicated that the funds obligated to be paid by Defendant, a separate entity, would not be transferred until the "General Releases" were executed. T. Smith stated that the "General Releases" were not a condition of the deal with Defendant, and that the parties could resolve any issues with the releases after these deals were completed. Defendant refused to fund the Agreements of Purchase and Sale, but continued operating the stores for the entire day on July 11th, 2012 until approximately 5pm. At that time on July 11th 2012, Defendant removed its equipment and informed T. Smith that it would not fund or complete the transactions.

31. Plaintiffs further allege that as a result of the course of conduct, affirmative promises, lack of conditioning the deal on the execution of the "General Releases" and the promises to pay secured creditors of BJQ and TNT related to the assets being sold, and the emails described above, Plaintiff's

reasonably and detrimentally relied on such promises and confirmations that if the Defendant could not locate someone to execute the Agreements of Purchase and Sale then "*this email indicates that this deal is completed* ...", such email not being conditioned in any manner on the execution of any "general release."

32.     Plaintiffs completed, and stand and continue to stand, ready, willing and able to complete and perform any and all further provisions of the Agreements of Purchase and Sale.

## **COUNT I: BREACH OF CONTRACT**

33.     Plaintiffs repeats and incorporate by reference all of the allegations set forth in paragraphs 1 through 32 above as if fully set forth herein.

34.     The Agreements of Purchase and Sale constituted offers that were accepted by the Plaintiffs.

35.     The Agreements of Purchase and Sale are supported by consideration, in that each party promised to perform an obligation they were not legally obligated to perform, or agreed to refrain from taking some action that they were legally permitted to take.

36.     To the extent the Agreements of Purchase and Sale were required to be signed: (a) the Agreements of Purchase and Sale were in fact signed by the email from Bowers on July 11th, 2012, when he stated " if I can find someone to execute the agreements once our due diligence is completed. *If I can't than this email indicates that this deal is completed* ..."; and (b) to the extent the Agreements of Purchase and Sale were nevertheless required to be signed, Defendant is prevented from asserting such defect under the doctrine of promissory estoppel, in that Defendant represented to Plaintiffs that the agreement was complete and that it would sign such Agreements of Purchase and Sale, Plaintiffs

reasonably related such promises, Plaintiffs detrimentally relied on such promises in that Plaintiff's (i) allowed the stores to be operated by Defendant; (ii) allowed Defendant to take control over the employees; (iii) allowed Defendant to communicate with customers and inform them of the sale; (iv) communicated with creditors to arrange for payoff of liens; (v) relied on Defendant's execution of agreements assuming the obligations under the leases associated with the Agreements of Purchase and Sale, and otherwise treated the transaction as completed thereby; and (c) if such Agreements of Purchase and Sale are not enforced, a fraud will be perpetuated on Plaintiffs.

37. The subject matter of the Agreements of Purchase and Sale are legal, namely the purchase and sale of assets.

38. Defendant was obligated to pay to Plaintiffs, the following: Eight Hundred Thousand Dollars and No Cents ($800,000.00) to Plaintiffs for the purchase of the two stores in Pennsylvania and inventory in the two stores; Two Hundred Fifty-Eight Thousand Four Hundred Dollars and No Cents ($258,400.00) for the purchase of store in Ohio; upwards of Fifty Thousand Dollars for inventory at the store in Ohio, based on a calculation of 50% of the value of the inventory); and Ten Thousand Three Hundred Eighty-Three Dollars and Sixty-Five Cents ($10,383.65) for the prepaid portion of rent for the three stores.

39. As a result of the Defendant's breach of contract, Plaintiffs has suffered damages totaling One Million One Hundred Eighteen Thousand Seven Hundred Eighty-Three Dollars and Sixty-Five Cents ($1,118,783.65) and continues to accrue consequential and incidental damages related to the breach by Defendants.

40. Defendant has verbally repudiated the Agreements of Purchase and Sale and refused to perform them.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor and issue an Order awarding Plaintiffs the following relief against Defendant:

A. Not less than One Million One Hundred Eighteen Thousand Seven Hundred Eighty-Three Dollars and Sixty-Five Cents ($1,118,783.65), representing the purchase price under the Agreements of Purchase and Sale;

B. Attorneys fees and costs pursuant to the express provisions of the Agreements of Purchase and Sale;

C. All other direct, incidental and consequential damages resulting from Defendant's breach of contract; and

D. All other damages that the Court deems fair and just.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs hereby demands a trial by jury in this action of all issues so triable.

Respectfully submitted,

Dated: July 12, 2012                      /s/
                                             Joshua A. Glikin (Bar No. 026852)
                                             glikin@bowie-jensen.com
                                             Michael W. Siri (Bar No. 026965)
                                             siri@bowie-jensen.com
                                             Vincent M. Guida (Bar No. 027896)
                                             guida@bowie-jensen.com
                                             BOWIE & JENSEN, LLC
                                             29 W. Susquehanna Avenue
                                             Suite 600
                                             Towson, Maryland  21204
                                             (410) 583-2400
                                             Facsimile: (410) 583-2437

*Counsel for Plaintiffs TNT Sales & Service, Inc., BJQ Sales & Service, LLC, Thomas M. Smith, Tony M. Trombley, and Duane A. Smith.*